## No. 11,477.

### SHANK v. THE PEOPLE.

Decided June 1, 1926.   Rehearing denied June 28, 1926.

Plaintiff in error was convicted of first degree murder.

*Affirmed.*

1.  JURY—*Qualifications—Court Discretion.* Where a juror, although entertaining an opinion as to the guilt or innocence of a defendant, says he will be governed by the evidence and instructions, the question of his qualification to serve rests in the discretion of the court.

2.  CRIMINAL LAW—*Homicide—Insanity—Burden.* The killing being admitted or proven, an accused who relies upon the absence of sanity as a defense, must produce evidence which will at least raise a reasonable doubt of its existence.

3.     *Jury—Capital Punishment.* In view of section 6665, C. L. '21, a juror who declares that notwithstanding evidence and instructions he would under no circumstances vote to inflict the death penalty, is properly excused.

4.     *Instructions—Manslaughter.* In a homicide case, under the facts disclosed, an instruction on manslaughter was properly refused.

5.     *Instructions—Insanity.* In a homicide case, a requested instruction on the subject of guilty intent, that the jury should acquit if it found defendant was incapable, by reason of mental derangement, of forming such an intent, held properly refused.

6.     *Instructions—Insanity.* In a homicide case, an instruction on the question of insanity held correct under the evidence.

7.     *Insanity—Reasonable Doubt.* In a homicide case the question of reasonable doubt as to defendant's sanity is for the jury, and its finding thereon, based on conflicting evidence, is not reviewable.

8.     *Verdict—Newspaper Influence.* Even where jurors read newspaper comments on the trial of a criminal case, the verdict will not be set aside if the defendant is not prejudiced thereby, or if objection might be, but was not, made prior to verdict.

9.     *Insanity After Verdict and Before Sentence—Discretion.* After verdict in a criminal case and before sentence, an application by defendant to have his sanity determined by a jury, is addressed to the sound discretion of the trial court. Under the facts disclosed in the instant case, there was no abuse of discretion in denying the application.

*Error to the District Court of the City and County of Denver, Hon. Charles C. Sackmann, Judge.*

Mr. O. A. ERDMAN, Mr. CHARLES GINSBERG, for plaintiff in error.

Mr. WILLIAM L. BOATRIGHT, Attorney General, Mr. LOUIS W. BURFORD, Assistant, Mr. FOSTER CLINE, Mr. A. L. BETKE, for the people.

*En banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

Plaintiff in error, hereinafter referred to as defendant, prosecutes this writ to review a death sentence pronounced against him on a verdict of guilty of first degree murder. His victim was his wife, and his defense was insanity. He says the judgment must be reversed for the following reasons: (1) Certain jurors who held disqualifying opinions should have been excused therefor; (2) others were erroneously excused for such opinions; (3) the jury was not properly instructed as to manslaughter, criminal intent, and insanity; (4) the verdict should have been set aside for insufficient evidence and improper influence; (5) after verdict, and before sentence, defendant's sanity should have been judicially determined.

Under a strict application of the rules governing such reviews these assignments would require scant consideration because they fall into these three classes: Those in which we are asked to overrule all our former decisions on the same question, those based on instructions not abstracted, and those based on questions of fact decided by the jury on conflicting evidence. However, considering the enormity of the crime charged and the extremity of the sentence, we have neither relied upon these rules nor been content with an examination of briefs and abstract, but have read the entire transcript and carefully re-examined long settled questions.

The essential facts of this tragedy are undisputed. The husband and wife were married September 4, 1902, and at the time of the homicide were living together in Denver. Their son Paul, nineteen years old, and their daughter Ruth, twenty-one, resided with them. Paul weighed approximately the same as his father but was taller. Defendant had always been a stubborn man with a tendency to be morose and little given to conversation. He frequently disagreed with his wife and daughter, particularly about repairing their dwelling and building a new one. Some years before he had attempted to strike Paul while the latter was ill in bed. Mrs. Shank came

between them and was knocked down. After finishing high school Ruth took a course in the state university. Her father at that time owned his little home and had about $3,000 in cash. He "thought the university could get along without her," but offered to give her $2,000 for her education. It was agreed that instead he should give her $500 at the beginning of each year. He actually paid out for this purpose something less than $2,000. As time went on the family relations became more strained. The daughter was always an advocate of her mother, but the son was neutral. Mrs. Shank's health finally broke down, and about 1920 she underwent a serious operation and spent some weeks in a hospital. Thereafter medical attention was frequently required. Defendant seemed to resent this. He had for many years been afflicted with hay fever and imagined that his wife's illness caused an odor which aggravated his trouble when he was much about her. October 2, 1924, Ruth, for the first time, revealed her own feelings in a long and intimate letter to her father in which she returned money he had sent her and begged him to devote it to the comfort of her mother and brother. She pointed out to him in a most kindly way his own shortcomings which contributed to the family unhappiness, protested the love of all three for him, reminded him of her mother's illness, disappointments, and need of affection, and begged him to change his conduct. This letter, instead of accomplishing its purpose, only served as an added irritant. In the summer of 1925 Ruth and her mother were in California. They returned September 2, and the friction was at once renewed. September 4, the old subject of needed repairs was taken up and some were made. During the preceding argument defendant raised his hands as if to strike his daughter and she said to him, "Don't touch me. Are you crazy?" Mrs. Shank then called out, "Papa is going to hit Ruth," whereupon Paul entered the room and said, "Don't worry mamma. He won't touch her." At the close of this altercation Ruth left

the house with assurances to her mother that she would
stand by her. As a result of the trouble the daughter,
who about this time began teaching in the city schools,
took up her residence elsewhere. In the forenoon of
Saturday, September 12, Mrs. Shank, accompanied by
Ruth, went to the office of attorney Garwood, an old
friend of the family, and laid her troubles before him.
About noon of that day he called on defendant at his
shop. While Shank did most of the talking, Garwood
told him there were three ways open for a settlement of
the family difficulties; a private conference and recon-
ciliation with his wife, an amicable separation, or court
action, and urged the first. As a result of this interview
defendant had some talk with his wife, but they made no
progress and she sent Garwood word to proceed. Mrs.
Shank was taken ill on Sunday the 13th (from which
illness she was confined to her bed until her death), and
Ruth thereupon came home. On the evening of the
15th defendant retired on the sleeping porch where he
and Paul had single beds. The latter was out. Mrs.
Shank and Ruth slept together in a double bed in an ad-
joining room. About 10 p. m. an officer came to the
house and inquired for defendant. His daughter called
him. He dressed, came out, and was served with sum-
mons and copy of a complaint in a divorce action. The
ground stated therein was extreme and repeated acts of
cruelty. None of these were specified but the complaint
recited that a bill of particulars would be furnished on
request. Defendant read the papers and the officer de-
parted. Defendant returned to his bed, but did not un-
dress. He lay there thinking things over. He says that
after the quarrel of September 4, he had some thought of
violence against his wife and daughter, but at the time
he retired on the evening of the 15th this had passed,
and he was then untroubled and entertained no malice.
At midnight Paul came home and went to bed on the
sleeping porch. About 2 a. m. defendant went outside,
climbed to an attic, procured a gun and ammunition and

1eturned. He says by 4 a. m. he had concluded that if the family could not live together in peace it was best to end it all, and, as he felt responsible for them, he decided to kill all three and commit suicide. He says he knew this was "a terrible thing." He thereupon shot Paul as he lay sleeping and started toward the room of his wife and daughter. They were awakened by the noise and his wife called, asking him what caused it. He answered, "a lamp globe." She then turned on a reading lamp on the bed. The light revealed defendant standing in the room with the gun pointed toward his wife who slept on the side next to him. Ruth cried out and sprang to his side. He knocked her over and fired, killing his wife. A scuffle then ensued between father and daughter in the course of which the latter escaped from the room and ran screaming outside. Defendant pursued, overtook, and beat her with the gun. A neighbor, awakened by the girl's cries, sprang through his window, grappled with defendant and disarmed him. Ruth took refuge in an adjoining home and officers who were called found defendant in his bathroom in the dark with his clothes partly saturated with water, arrested and incarcerated him. Defendant says he attempted to drown himself in the bathtub.

1.  Certain jurors were challenged for opinions on the subject of guilt, formed or expressed. In each instance the juror said the opinion was not an unqualified one and, notwithstanding it, he could and would be governed by the evidence and instructions. Under such circumstances the question of qualification rests in the discretion of the court. The rule is settled in this jurisdiction by statute, and a long and unbroken line of decisions. Sec. 5883, p. 1558, C. L. 1921; *McGonigal v. People,* 74 Colo. 270, 220 Pac. 1003.

Defendant's last peremptory challenge was used on a juror who had stated that in arriving at a verdict he would consider the killing by the accused of the mother

of his children as a predominating factor. When the juror's attention was called to other elements he clearly qualified, saying he would give defendant the benefit of any doubt of his sanity, if that were a defense. He had apparently learned for the first time that the killing was admitted and his answer showed the natural reaction of a normal man. He might have gone further and stated that the fact of an unjustifiable homicide would be the predominating factor, because, while up to that point the prosecution carries the burden of proof beyond a reasonable doubt, sanity is presumed. He who relies upon its absence must then produce evidence which will at least raise a reasonable doubt of its existence. "The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, * * *." Sec. 6681, p. 1733, C. L. 1921. Hence the predominating factor in every verdict of guilty of murder should be an unjustifiable homicide.

2. Certain jurors declared that, notwithstanding evidence and instructions, they would, under no circumstances, vote to inflict the death penalty. They were properly excused. "If murder of the first degree, the jury shall in its verdict fix the penalty to be suffered by the person so convicted, either at imprisonment for life at hard labor in the penitentiary, or at death; and the court shall thereupon give sentence accordingly." Sec. 6665, p. 1731, C. L. 1921; *Jones v. People,* 6 Colo. 452, 455, 45 Am. Rep. 526; *Demato v. People,* 49 Colo. 147, 111 Pac. 703, 35 L. R. A. (N. S.) 621, Ann. Cas. 1912A, 783; *Hillen v. People,* 59 Colo. 280, 149 Pac. 250.

We are urged to overrule these authorities. We approve their reasoning, hence cannot alter the rule. The general assembly, acting within its province, determined that the death penalty was proper in some cases of first degree murder. The designation thereof it vested in the discretion of jurors. Its purpose to have that discretion

exercised according to the facts is evident. A juror who, by reason of conscientious scruples, cannot fix the death penalty on *any* state of facts, has no discretion to exercise; one who can, but will not, refuses to obey the law. If either remains he usurps a legislative function and abolishes the death penalty, or forces a disagreement. Both are disqualified.

3. The court refused to instruct on manslaughter. If there was evidence that defendant had been the victim of a serious and highly provoking injury sufficient to excite an irresistible passion in a reasonable person, or an attempt by his wife to commit a serious personal injury upon him, and no sufficient interval between the provocation and the killing for the voice of reason to be heard, this ruling was erroneous. We are forced to hold, as a matter of law, that there was no evidence of such provocation and undisputed evidence of such interval. Reason and humanity here spoke, unless they were voiceless.

On the subject of "guilty intent" defendant requested an instruction for acquittal if the jury should find that he "was incapable, by reason of mental derangement, to form such an intent." It was properly refused. One who knows right from wrong and has power to choose necessarily has power to form the intent to choose. One who does not or has not is, in law, insane. The point was therefore covered by the court's instruction on insanity.

The court's instruction No. 7 reads: "On the subject of insanity the court instructs you as follows: A person who is so diseased in mind at the time of the act as to be incapable of distinguishing right from wrong with respect to that act, or, being able to so distinguish, has suffered such an impairment of mind by disease as to destroy the will-power and render him incapable of choosing the right and refraining from doing the wrong, is not accountable; and this is true howsoever such insanity may be manifested, whether by irresistible impulse or otherwise. But care should be taken not to confuse such mental disease with moral obliquity, mental depravity,

or passion growing out of anger, revenge, hatred or other motives, and kindred evil conditions, for where the act is induced by any of these causes the person is accountable to the law.

At the commencement of the trial the defendant is presumed to have been sane at the time of the alleged commission of the crime charged.

It is not incumbent on the defendant, in order to entitle him to an acquittal on the ground of insanity, to prove to your satisfaction that he was insane when the act was committed. If upon the whole case you believe that the defendant was insane at that time, or if upon the whole case you have a reasonable doubt as to whether or not he was sane at that time, you should find him not guilty."

The first paragraph of defendant's requested instruction No. 2, which was refused, reads:

"The jury are instructed that the mind may be so impaired by disease as to lose all appreciation of duty to society in one or many particulars, or realizing the duty, be incapable of performing it. Where the evidence of delusion shows that a person is so insane at the time of the commission of the act as to be incapable of entertaining criminal intent, it is, in point of law, insanity as to all acts resulting from such delusion, and in such circumstances the act is no more a crime than a like act would be in a person totally mad."

It is contended this was a correct statement of the law and was not given. So far as it relates to criminal intent it was covered by said instruction No. 7; so far as it relates to duty to society it was immaterial. The rejected paragraph is copied verbatim from the opinion of Mr. Justice Bailey in *Ryan v. People,* 60 Colo. 425, 427, 153 Pac. 756. It did not decide the point there before the court, had but a general relation to it, and, except as it bears on the question of intent, has no applicability to the present case. In the Ryan case we merely repudiated the English rule that to constitute a defense, the

insane delusion which prompts a crime must be of the existence of a fact which, if true, would justify the act. Mr. Justice Bailey himself, at page 429 of the same opinion, in language quoted, but apparently misconstrued, by counsel for defendant here, thus lays down the rule and its application: "The controlling question is the sanity or insanity of the accused with respect to the act, and upon trial of this issue there is, in legal contemplation, no middle ground, the defendant is either sane or insane, and therefore culpable or inculpable, according as that question may be determined by the jury from the evidence."

In the light of the evidence in the instant case the jury was correctly instructed on the defense of insanity.

4. It is said the verdict is not supported because there was sufficient evidence to raise a reasonable doubt of defendant's sanity. A number of properly qualified laymen said he was sane. Others denied it on the most trivial grounds, i. e., he did not laugh at somebody's joke; he was "vicious" under cross-examination; his shoulders twitched; he was very quiet; he seemed in a deep brown study; he did not like a man and once threw an apple core at him because he was a German.

Two qualified alienists testified that defendant was insane, and one that he was not. The testimony of the first two carries no conviction to the ordinary mind, and is presuasive only because of the high character of the witnesses who gave it. They said defendant was suffering from dementia praecox, or premature dementia; that the disease was incurable; and that it was manifest by delusions. They found proof of this insanity in his theory concerning his hay fever, his offer, under the circumstances, to advance his daughter $2,000 instead of paying her expenses as incurred and keeping the remainder of the fund at interest in a saving's account, the very enormity of his crime, and other things recited in the foregoing statement of facts. It seems hardly necessary to suggest that real or fancied irritants of hay

fever, as vouched for by the victims of that malady, are so numerous and absurd as to have passed into the current humor of the nation, or that the lack of a due appreciation of the importance of interest is even more prevalent, or that there is no suggestion in this record that Ruth did not intend to invest the fund allotted and not immediately required, or that the doctrine that the mental health of a criminal is measured by the grade of his crime has no place in our jurisprudence. These experts have much to say about defendant's irresistible impulses. Such impulses to slay do not know that the contemplated deed is a "terrible thing," do not select their victims sleeping, and are not careful to kill the strongest first. These jurors doubtless knew, what the common experience of mankind has taught, that these criminal impulses are too often irresistible only when those against whom they are directed are impotent, and become strangely controllable when suddenly confronted by an armed giant. The remedy is a stern one but the only time-tested measure of safety is to make of the law an armed giant. There may have been evidence here to raise in some minds a reasonable doubt of defendant's sanity, but that evidence was conflicting and the conclusion of this jury thereon is not reviewable here.

It is further urged that the verdict was the result of undue influence, exerted by newspaper articles appearing during the trial. No claim was made that these were seen by the jurors or the contents thereof brought to their notice in any way. Even where jurors read newspaper comments on the trial the verdict will not be set aside if defendant is not prejudiced thereby, or if objection might be, but is not, made prior to verdict. 16 C. J. sec. 2672, p. 1164; *Johnson v. People,* 33 Colo. 224, 242, 80 Pac. 133, 108 Am. St. Rep. 85.

5. At the time the motion for a new trial was overruled the district attorney moved for sentence. Thereupon counsel for defendant objected, "for the reason that he is at this time an insane person," and demanded

that that question be submitted to a jury. That demand was refused by the court. If defendant's position then was that there had been any change in his mental condition since September 16, 1925, the record does not disclose it. Neither does it disclose the offer of any new evidence on the subject, unless we consider the tender to the court of a certain alleged written statement signed by numerous acquaintances of defendant. No proper steps were taken to incorporate this in the record and it is not before us. The showing was wholly insufficient to justify the inquiry, but were it otherwise the application was addressed to the sound discretion of the trial court. Sec. 6639, p. 1725, C. L. 1921; *Bulger v. People,* 61 Colo. 187, 156 Pac. 800.

In passing upon the motion the trial court expressly approved the finding of the jury that defendant was sane at the time of the commission of the crime, and added: "Nothing new has been presented to the court, no change in conditions, actions or mental responsibility of this defendant since the time of committing the act and the present time   *   *   *. There is no doubt in the mind of this court that this man is legally and intellectually sane."

There was then no abuse of the court's discretion and the ruling was correct.

The most careful scrutiny fails to reveal any prejudicial error in this record. A brutal double assasination was admitted; its only defense was the unsupported one of insanity; its only excuse was insufficient to justify a blow. Every protection which law or reason required was vouchsafed the perpetrator. The penalty imposed was doubtless intended by the legislature for just such cases. Judge and jurors apparently discharged their most disagreeable duties with fairness and firmness. We can do no less. The judgment is affirmed, and it is ordered that it be executed during the week commencing Monday, September 13, 1926.

MR. JUSTICE ADAMS, not participating.