Ricky Ray RECTOR *v.* STATE of Arkansas

CR 83-39                                    659 S.W.2d 168

Supreme Court of Arkansas
Opinion delivered October 17, 1983
[Rehearing denied November 21, 1983.]

*Stripling & Morgan,* by: *Dan Stripling* and *M. Watson Villines, II,* for appellant.

*Steve Clark,* Atty. Gen., by: *Alice Ann Burns,* Deputy Atty. Gen., for appellee.

GEORGE ROSE SMITH, Justice. Ricky Ray Rector was charged with capital murder in the shooting of Bob Martin, a Conway city policeman acting in the line of duty. Ark. Stat. Ann. § 41-1501 (1) (b) (Repl. 1977). In a bifurcated trial the jury returned a verdict of guilty and imposed the death penalty. Nine separate points for reversal are argued. Counsel state with commendable candor that several other possible points are not being urged, for want of merit. We affirm the judgment.

The first stage of the trial was brief, the facts being essentially undisputed. On March 22, 1981, Rector, age 28, shot and killed Arthur Criswell at a restaurant in Conway and wounded two other men. For two days the police searched for Rector. On the afternoon of March 24 Officer Martin, in uniform, went to the home of Rector's mother, in Conway. While the officer was talking to Rector's mother, sister, and nephew, Rector entered the back of the house and came into the living room. Rector and the officer knew each other and may have exchanged a few words of greeting. Within a few minutes Rector, who had not joined in the conversation, drew a pistol and shot Officer Martin twice. Rector left by the back door and said to his nephew's wife, whom he met crossing the yard: "I just shot that cop." A few moments later Rector attempted suicide by shooting himself in the forehead, the bullet entering the front part of his brain. That evening the wound was surgically cleaned and closed.

Among the points for reversal, we first consider the argument that death-qualified juries are unconstitutional. That question was left open in *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968), because the Court found the evidence too tentative and fragmentary to support a firm conclusion. We do not take that disposition of the issue to carry an implication that the Court would necessarily have disapproved death-qualified juries if the proof had been complete.

Since *Witherspoon* the state courts have uniformly upheld the validity of death-qualified juries. (The force of our own cases is conceded by the appellant, who asks that they be overruled.) The federal courts of appeal, however, are not in agreement. In the Seventh Circuit the court left the question open in 1976, finding the proof still inconclusive. *United States ex rel. Clark* v. *Fike,* 538 F.2d 750 (7th Cir. 1976). In the Fifth Circuit the court assumed, without deciding, that death-qualified jurors are prone to convict, but the court nevertheless upheld the death-qualified jury. Its reasoning was in part that a juror implacably opposed to capital punishment might choose to hang the jury even in the face of overwhelming proof, with the possibility that a succession of such mistrials could defeat the State's attempts to enforce its death penalty. *Spinkellink* v. *Wainwright,* 578 F.2d 582 (5th Cir. 1978), followed with further discussion in *Smith* v. *Balkcom,* 660 F.2d 573 (5th Cir. 1981).

In our circuit, the Eighth, the court has apparently interpreted *Witherspoon* to mean that if death-qualified juries had then been shown to favor the prosecution, the Supreme Court would have prohibited such juries. *Grigsby* v. *Mabry,* 637 F.2d 525 (8th Cir. 1980). We so understand the *Grigsby* opinion simply because the majority, without discussing the issue on its merits, flatly stated that if it can be shown that death-qualified juries are more likely to convict, "Grigsby has made a case that his constitutional rights have been violated and he would be entitled to a new trial." The case was accordingly remanded to the Arkansas district court to allow it to determine as a question of fact whether death-qualified juries are prone to convict.

The *Grigsby* opinion, remanding the case, was delivered on November 18, 1980. The district court completed its evidentiary hearing in July, 1981. The district court then delayed the case for more than two years, with Chief Judge Eisele finally issuing a 91-page opinion on August 5, 1983, declaring death-qualified juries to be unconstitutional. *Grigsby* v. *Mabry,* 569 F. Supp. 1273 (E.D. Ark. 1983). Since that opinion is the first one not only examining the factual issues in detail but also banning the death-qualified jury, we

have thought it best to re-examine the issue in the light of that opinion.

At the outset we must clear the air by commenting on a ten-page analysis in the district court's *Grigsby* opinion, purportedly tracing the history of jury selection in capital cases in Arkansas and criticizing this court for its recent decisions in that field of law. Manuscript opinion, pp. 71-81. The district judge evolved a theory (based on our decision in *Atkins* v. *State,* 16 Ark. 568 [1855], and on an 1869 statute permitting a challenge for implied bias if a juror had such conscientious opinions as would preclude him from finding the defendant guilty, Ark. Stat. Ann. § 43-1920 [Repl. 1977]) that the Arkansas law originally permitted a challenge for cause only if the venireman could not find the defendant *guilty,* regardless of the venireman's attitude about the death penalty. The opinion, noting that our later cases permit the challenge if the venireman cannot impose the death penalty, then puts the question: "When and how did the Arkansas law change?"

The court answers its own question by concluding that between 1968 and 1970, and in response to the ruling in *Witherspoon*:

> [The Arkansas Supreme Court] decided to no longer adhere to the limitation and exclusion of jurors as provided by the statute. Instead, it decided that if a juror could never vote to impose the death penalty, he could be excluded altogether. No inquiry apparently had to be made as to whether the juror was nevertheless capable of rendering a fair and impartial verdict upon the guilt or innocence of the defendant. . . .
>
> . . . .
>
> The bottom line of this analysis is that prior to *Witherspoon,* Arkansas focused on the most traditional and accepted of *voir dire* inquiries: whether a prospective juror's scruples would preclude him from rendering a verdict of guilty and the court relied directly on the legislatively mandated language. After

*Witherspoon,* the court no longer relied on the exclusion statute but simply adopted *Witherspoon* as the predicate for a *judicially established Arkansas rule* that allowed the exclusion of prospective jurors from the guilt-innocence phase on the ground that they could never impose the death penalty if called upon to assess a penalty. [District Court's italics.]

There is more to the same effect.

The district judge's decidedly critical analysis of our cases would be disturbing if it were not so readily apparent that the analysis and criticism are totally and demonstrably wrong. Our decision in *Atkins* did not even remotely contemplate that a jury might first find a defendant guilty of a capital offense and then select or reject the death penalty. The simple fact, evidently unknown to the district court in *Grigsby,* is that from statehood until 1915 the death penalty was mandatory in all capital cases, the jury taking no part in fixing the penalty. Rev. Stat., ch. 44, div. 3, art. 1, § 7 (1837). That was of course true in 1869, when the implied bias provision was enacted. As reflected by scores of appellate records in the state's archives, the usual guilty verdict was: "We, the jury, find the defendant guilty of first-degree murder, as charged in the indictment." That ended the trial, with the jury being discharged and the court entering the judgment as fixed by law.

Thus this court did not change its position in response to *Witherspoon.* We changed a half century earlier, to give effect to the 1915 statute which for the first time recognized life imprisonment as a permissible sentence in Arkansas and made it an alternative punishment in all capital cases. Ark. Stat. Ann. § 43-2153. All this was fully explained almost twenty years before *Witherspoon* when we said in *Needham v. State,* 215 Ark. 935, 224 S.W.2d 785 (1949):

During the selection of the jury the prosecuting attorney was permitted to ask each juror if he had any conscientious scruples against the imposition of the death penalty. The statute defines implied bias as including such conscientious opinions as would pre-

clude the juror from finding the defendant guilty of an offense punishable by death. Ark. Stats. (1947) § 43-1920. It is argued that the State should have been allowed to inquire only whether the juror's conscience would preclude his finding the defendant guilty, thereby permitting the service of jurors who would vote for a verdict of guilty but approve only the alternative penalty of life imprisonment. The history of our statutes rebuts this suggestion. When the statute defining implied bias was enacted the death penalty was mandatory; so it was then sufficient for the legislature to refer merely to a finding of guilt, the punishment following as a matter of course. Not until 1915 did the legislature give the jury the option of imposing life sentences in capital cases. *Ibid.*, § 43-2153. The legislature evidently meant for the jury to exercise its discretion in selecting the punishment, but it is obvious that a juror can exercise no discretion if his conscience does not permit him to vote for the death penalty in any case. The statutory history in Idaho has been identical with our own, and there it is held proper for the State to inquire whether a juror has scruples against capital punishment. *State* v. *Wilson,* 41 Idaho 616, 243 P. 359. Among many other cases approving this inquiry when the jury in its discretion may impose a life sentence are: *Shank* v. *People,* 79 Colo. 576, 247 P. 559; *State* v. *Leuch,* 198 Wash. 331, 88 P.2d 440; *State* v. *Favorito,* 115 N.J.L. 197, 178 A. 765.

We do find it bewildering that the *Grigsby* opinion, at page 80, quoted the very next paragraph in the *Needham* opinion without attaching any weight to what had just preceded it.

The federal court invalidated the death qualification of jurors on two grounds: "first, it denies the accused a trial by a jury representative of a cross-section of the community; and second, it creates juries that are conviction-prone." In the trial of the case at bar those grounds were relied upon in Rector's motion for a bifurcated trial with two juries. That motion was supported by a stipulation, agreed to by the prosecution, that Dr. Robert M. Berry is an expert in the area and would testify in conformity with his recent article,

*Death-Qualification and the "Fireside Induction,"* 5 UALR
L.J. 1 (1982). The trial judge overruled Rector's motion.

We need consider only the federal court's second
finding, that conviction-prone juries are for that reason
unconstitutional, because if the State has a significant
interest that justifies the exclusions inherent in the death-
qualification process, it is immaterial that the excluded
veniremen might be considered to be a distinctive group in
the community. *Duren* v. *Missouri,* 439 U.S. 357 (1979).

For this discussion we assume, as did the court in
*Spinkellink,* that death-qualified jurors are more prone to
convict than those excluded under *Witherspoon.* The ques-
tion, then, is this: Should jurors unalterably opposed to
capital punishment be permitted to participate in the
determination of guilt or innocence in capital cases? We are
firmly of the view that their exclusion is proper, for either of
two reasons.

First, we cannot regard conviction-proneness either as
inherently wrong or as destructive of the juror's impar-
tiality. In the various studies on the subject there is almost
uniformly an undercurrent of thought, not expressed but
easily sensed, that jurors who believe in the death penalty are
by their nature barbarians in modern society. That view
certainly condemns most Americans. The Arkansas General
Assembly, in common with the legislatures in at least two
thirds of the other states, re-enacted a death-penalty statute
after the Supreme Court struck down all such laws in 1972.
Needless to say, we as judges are under a duty to respect and
give effect to the laws made by the people or their repre-
sentatives, no matter what our personal beliefs might be.

We have no reason to doubt that any tendency of a
particular juror, not inflexibly opposed to the death penalty,
to lean toward conviction in capital cases arises from one of
the most deeply rooted feelings in human beings: an
instinctive urge to condemn injustice. That urge, depending
upon the comparative atrociousness of the particular of-
fense, may vary from resentment to indignation, then to
anger, and finally to outrage. It cannot be expected that a

juror's ability to reason with complete detachment will be wholly unaffected by such an uncontrollable reaction of human nature to shocking injustice.

Human nature is not unconstitutional. From the earliest days of the common law, which ultimately created the jury system now embedded in our constitutions, the human urge to redress manifest wrongs played its part in the development of the criminal law. Justice Holmes, in tracing that development, pointed out that there are many crimes with respect to which the wrongdoer cannot be forced by the law to compensate the principal sufferer, as in the case of murder or manslaughter. Holmes then went on to show how, in that situation, punishment of the wrongdoer becomes necessary:

> In all these cases punishment remains an alternative. A pain can be inflicted upon the wrong-doer, of a sort which does not restore the injured party to his former situation, or to another equally good, but which is inflicted for the very purpose of causing pain. . . . The prisoner pays with his body.
>
> The statement may be made stronger still, and it may be said, not only that the law does, but that it ought to, make the gratification of revenge an object. This is the opinion, at any rate, of two authorities so great, and so opposed in other views, as Bishop Butler and Jeremy Bentham. . . .
>
> The first requirement of a sound body of law is, that it should correspond with the actual feelings and demands of the community, whether right or wrong. If people would gratify the passion of revenge outside the law, if the law did not help them, the law has no choice but to satisfy the craving itself, and thus avoid the greater evil of private retribution. At the same time, this passion is not one which we encourage, either as private individuals or as law-makers. Moreover, it does not cover the whole ground. There are crimes which do not excite it, and we should naturally expect that the most important purposes of punishment would be coextensive with the whole field of its application. [O. W. Holmes, The Common Law, pp. 40-42 (1881).]

As Holmes implied, some crimes do not excite the feeling of outrage in law-abiding citizens, but such lesser offenses are not punishable by death. Capital offenses characteristically comprise the most atrocious of crimes: the murder of helpless victims of rape or robbery and the murder of law enforcement officers, who stand in their line of duty between the ordinary citizen and the ruthless criminal. We may ask, why should the most cowardly and contemptible of criminals, merely by reason of the viciousness of their crimes, be favored in jury selection to a greater degree than any other accused person or any litigant in a civil case? The studies opposing death-qualified juries present no answer to that inquiry.

One would expect the most upright and moral veniremen to be the ones most deeply outraged by the type of crime for which the prosecution seeks the death penalty. Must we say that a jury composed of such veniremen cannot be regarded as impartial? On this point a clear indication of legislative policy is to be found in the federal and Arkansas statutes excluding convicted felons from jury service. 28 U.S.C. § 1865; Ark. Stat. Ann. § 39-102 (Supp. 1983). Unquestionably that exclusion is intended to bar from the jury box the one class of persons least likely to respect and give effect to the criminal laws. Are those statutes unconstitutional as depriving an accused of jurors *not* prone to convict? Obviously not. In harmony with that legislative point of view, we can find no unconstitutional want of impartiality in the makeup of a death-qualified jury.

Our second reason for disagreeing with the *Grigsby* conclusion is a practical one: A jury system that has served its purpose admirably throughout the nation's history ought not to be twisted out of shape for the benefit of those persons least entitled to special favors. It has always been the law in Arkansas, except when the punishment is mandatory, that the same jurors who have the responsibility for determining guilt or innocence must also shoulder the burden of fixing the punishment. That is as it should be, for the two questions are necessarily interwoven. By analogy, in civil cases we do not affirm a finding of liability but remand for a determination of damages only, because the possibility of a

compromise in the jury room links the two issues insep-
arably together. *See Fulbright* v. *Phipps,* 176 Ark. 356, 3
S.W.2d 49 (1928); *Manzo* v. *Boulet,* 220 Ark. 106, 246 S.W.2d
126 (1952). No similar problem seems even to have arisen in
our criminal cases.

Every accused person being tried by jury is protected by
a host of constitutional guaranties, particularly significant
ones being the continuing presumption of innocence, the
state's burden of proof beyond a reasonable doubt, the
privilege against self-incrimination, and the unanimous
verdict. Even with those guaranties, however, we should not
be averse to suggested changes in the jury system (which we
think should be specified by legislation, not by judicial
directive) if the resulting advantages could be shown to
outweigh the disadvantages. So far we have not seen a
suggested change meeting that test.

The *Grigsby* proposed modification, involving the
same case being tried twice before successive juries, is the
least appealing of the possibilities that have come to our
attention. Such a second trial would be comparable to
having the actors in a play, after the audience has left the
theater, repeat their lines in a second performance for a few
spectators in a nearly empty house. Such repetitive trials
could not be consistently fair to the State and perhaps not
even to the accused.

Other suggested modifications have included (a) the
empaneling of a second jury at the outset, to listen to the
actual trial, and (b) the selection of alternate jurors to
replace, in the penalty phase of the trial, those jurors who
could not vote for the death penalty in any circumstances.
Colussi, *The Unconstitutionality of Death Qualifying a
Jury Prior to the Determination of Guilt,* etc., 15 Creighton
L. Rev. 595 (1982). The difficulty with both those schemes
for shuffling jurors in and out of the jury box is the
separation of certain jurors' responsibility for the verdict
from their responsibility for fixing the penalty. The two
must go hand in hand, else the common law jury system no
longer exists.

Finally, we perceive no answer to the practical objection posed by the Fifth Circuit Court in the *Spinkellink* case, *supra*. That is, what is to prevent a juror strongly opposed to capital punishment, in an effort to avoid feeling *any* responsibility for a death sentence, from choosing to hang the guilt-innocence jury by a vote for acquittal? If that stratagem became common knowledge, as it certainly would, the state's interest in the even-handed application of its laws, including the death penalty statute, could be frustrated. In fact, capital punishment could in effect be abolished, not by popular will but by a deliberate ruse.

Our conclusion is that death-qualification of the jury in capital cases has been and continues to be a constitutional procedure.

A second argument for reversal is that the trial judge should have found Rector incompetent to stand trial against the death penalty. A parallel question of competency was decided adversely to Rector on his earlier appeal from his conviction for the murder of Arthur Criswell. *Rector* v. *State,* 277 Ark. 17, 638 S.W.2d 672 (1982). The proof in the two cases is quite similar, although in this case a witness for the State, Dr. Hamed, thought that Rector's condition was much improved as compared to the time Dr. Hamed saw Rector soon after his surgery.

The expert proof is in sharp conflict, as it was on the other appeal. It is argued, however, that it takes a higher degree of competency to defend against the death penalty; so the two appeals are distinguishable. No doubt the issues may be more extensive in a death case, in which aggravating and mitigating circumstances are involved, but we do not discern any basis in the testimony for relating Rector's mental condition to the defense of a capital charge in particular. We must conclude, as we did on the earlier appeal, that the trial judge's decision is not clearly erroneous.

Third, it is insisted that the trial judge should have granted a request for a sequestered voir dire examination of each prospective juror. A psychologist testified in gener-

alities about the defects in an unsequestered voir dire, but he actually brought up nothing that a trial judge would not know from his own experience. The motion for sequestration was addressed to the trial court's discretion. *Heffernan* v. *State*, 278 Ark. 325, 645 S.W.2d 666 (1983). The only possibly prejudicial remark heard by other veniremen was too inconclusive to call for a mistrial — a fourth point argued for reversal. We find no abuse of the trial court's discretion in its rulings upon these matters.

A fifth point is that venireman McKenna was not so opposed to the death penalty as to warrant the court in excusing him for cause. There are two answers to this contention, First, there was no objection to the excusal of McKenna. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982); *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980). Second, McKenna fundamentally took the position that he could not vote for the death penalty and perhaps not even for a life sentence without parole. He did say, however, in response to continued questioning by defense counsel: "I think — and this is really hypothetical — if I knew that the person accused would assuredly kill others in the future, then in that situation I guess I would reluctantly go along with it. Other than that, I would not." The Supreme Court has said, however, that a venireman should not be excused unless he is irrevocably committed to vote against the penalty of death "regardless of the facts and circumstances *that might emerge in the course of the proceedings.*" (Our italics.) *Davis* v. *Georgia*, 429 U.S. 122 (1976), quoting a *Witherspoon* footnote. There was certainly no possibility that in the course of this trial McKenna would know that Rector would assuredly kill others in the future. Hence McKenna was properly excused for cause. If this is not so, then defense counsel is always in a position to present to a venireman a totally irrelevant hypothetical situation and, if the juror admits that he might vote for the death penalty in that case, insist that the juror is acceptable. We do not understand the Supreme Court's decisions to have gone that far.

Sixth, venireman Thacker, who was eventually excused by the defense, said that in some circumstances he thought the death penalty would be appropriate for the killing of a

police officer, but he also said that his mind was not made up, there might be extenuating circumstances, and he would have to judge the case in the light of the total evidence. The appellant argues that the court should have sustained a challenge for cause, because Thacker's mind was set in favor of the death penalty, but we do not so interpret the record. The challenge for cause was properly denied.

Seventh, the prosecutor did inject remarks in the nature of argument in his opening statement to the jury, but the court at once gave a proper admonition to the jury. In view of the trial judge's unquestioned discretion in supervising the conduct of counsel, we find no abuse of that discretion in his denial of a mistrial.

Eighth, during the penalty phase of the trial the prosecutor requested that a personal note on an exhibit be removed before the jury saw the exhibit, but that request was denied. It is now argued that even the prosecutor's request called for a mistrial, because the ordinary rules of evidence do not apply to a defendant's presentation of mitigating proof. That statement is somewhat too broad, but in any event the incident was so decidedly trivial as not to require a mistrial.

Finally, it is argued that upon comparing this case with other capital cases we should reduce the penalty to a life sentence without parole. When we consider that in a period of two days Rector killed one man, for which he was convicted of murder, committed aggravated assaults upon two others, and then deliberately shot a police officer who had done nothing to provoke an attack, we find nothing arbitrary in this death sentence as compared to our other cases.

Counsel insist, however, that because Rector's self-inflicted brain injury had substantially the same effect as a frontal lobotomy, causing him to be mildly retarded mentally and to be somewhat unemotional, the State of Arkansas should not permit the execution of a person in that condition. This case differs, however, from *Giles* v. *State,* 261 Ark. 413, 549 S.W.2d 479 (1977), cert. denied 434 U.S. 894,

in that there the jury arbitrarily disregarded an impaired mental condition that existed when the crime was committed, which led us to reduce the sentence. Here Rector had no such mental impairment until he attempted suicide after the crime — facts that were before the jury. In our opinion such circumstances arising after the crime affect the matter of clemency and should properly be addressed to the Governor, who has the facilities for investigating all the facts. Although we may reduce a death sentence to life without parole, and have done so in the past, that action is taken as a matter of law, not as an act of clemency.

We find no prejudicial error in the contentions that are made for reversal or in any other matters that have been brought to our attention under Rule 11 (f).

Affirmed.

PURTLE, J., concurs.

JOHN I. PURTLE, Justice, concurring. I concur in the results of the opinion of this court but wish to comment on a portion of the opinion dealing with death qualified juries. The majority correctly states that persons who are unalterably opposed to the imposition of the death penalty should be excluded and I agree. I think *Witherspoon* is in accord with this view. The mistake made in some trial courts is in excluding persons who have moral or religious scruples against the death penalty but who would agree to impose it if the law and the circumstances warrant it in the case being tried. *Witherspoon* never intended to exclude this type juror. Neither did it indicate that only those who favored the death penalty should comprise trial juries. I think the correct procedure on this controversial issue lies somewhere between excluding prospective jurors who have scruples against the death sentence and including only those who have no scruples against imposing such a penalty. There is a readily apparent difference in the probable verdict of a jury composed of 12 people having scruples against the death penalty and 12 others who unquestionably favor it. It takes a mixing from both categories to form a jury which is representative of the community. Only those unalterably

opposed to the death penalty and those who actively support it should be excluded from serving when death is the possible penalty.

I have never thought that all or even most people who favor the death penalty are barbarians in modern society. However, I do feel that a jury composed of only such persons is not representative of any community. Neither would a jury composed only of those having scruples against the death penalty represent the community. The selection of jurors should not favor the accused nor should it favor the state. A properly selected jury enters upon its duties slanted toward neither side. Thus selected, it would not be proper to refer to the jury as a death qualified one. This controversy would disappear if the sentencing process utilized a different jury from the one which decided the question of guilt. This could be accomplished by either having a second jury or allowing the trial court to impose sentence. A second jury would be asked to consider aggravating and mitigating circumstances and vote on sentencing the person found guilty. In either event the law and our procedure would have to be amended to provide for such a process. Appellant's trial was conducted in accordance with present law and procedure.

The majority states the most cowardly and contemptible criminals are the ones who seek to prevent a death qualified jury. I am of the opinion that an accused is not considered to be a criminal, at least in the case being tried, until after he has been convicted. The right to an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution is not, in my opinion, a favored position not enjoyed by others. Everyone is entitled to the protection of our Constitution.