Carolyn Dianne ZACHRY v. STATE of Arkansas

CR 75-131                           538 S.W. 2d 25

Opinion delivered July 6, 1976

*Raffaelli & Hawkins,* by: *Louis J. Raffaelli, Ted Capeheart* and *Tackett, Moore, Dowd & Harrelson,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *Gary Isbell,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Carolyn Dianne Zachry, was charged with capital felony murder in the robbery-slaying of her husband, Curtis Eugene Zachry. She was found guilty by a jury, which sentenced her to life imprisonment without parole. From the judgment of conviction so entered, Mrs. Zachry brings this appeal, arguing seven points for reversal.

Appellant first contends that "there was insufficient evidence upon which to base a jury verdict and court judgment finding appellant guilty of capital felony murder."

Appellant's husband, Curtis Eugene Zachry, was found dead from gunshot wounds on the morning of January 9, 1975; he had also been robbed. As a result of subsequent police investigations, appellant was taken into custody at the Texarkana police station on January 21, 1975, and she gave a statement, written down by state policeman James Lester, that was introduced into evidence at her trial. In this statement, appellant first mentioned indignities that she had suffered during the last few years of her marriage, referring to being forced to engage in oral sex, constant beatings, and the fact that Zachry would not allow her to visit her parents. Zachry, however, was unwilling to let her obtain a divorce, and in October, 1974, she contacted Monroe Lindsey by telephone, telling him that she wanted to "get rid" of her husband and inquiring what it would cost. According to appellant, he answered that he would have it done for $5,000 and she met him about a week later and gave him this amount in cash. Subsequently, some few weeks later, when nothing had been done, she again reached Lindsey and he told her that the person that he had contacted had "skipped" and that she would have to come up with some more money. Mrs. Zachry said she was contacted by a man named Lumpkin and that this man told her he would kill her husband for $5,000 (Lumpkin said that Lindsey had talked with him), but that she told him to "forget about it." According to appellant, in the early part of December, 1974, she was contacted at her home by Charlie Bean, who came to her home alone. She said that Bean told her that he would take the con-

tract for $5,000 and would not have to be paid until after her husband had been killed. Appellant stated that she replied that she needed a few days to think about it, and about a week later offered to pay him $200.00 to "forget it," but that Bean insisted on going through with the job. She said that he came to her house, got the $200.00, another heavyset man with gray in his hair, being with him; that Bean told her that she could not "get out of the deal" and that the killing would be accomplished on Christmas Eve; however, she stated that she talked him out of killing her husband on Christmas Eve.

Appellant said that on January 8, 1975, around 7:30 P.M., the telephone rang and a man asked for "Eugene," her husband. She called the latter to the telephone and heard him advise the party on the other end of the line that he would see him after he was dressed. Thereafter, Bean (she did not see him but recognized his voice) came to the house and her husband advised that he was going with this man to buy some land and kissed her. "Eugene left with the man and I knew what was fixing to happen."

After about three hours, she called Herb McCandless, her husband's business partner, and told him that Eugene had not returned and that she was worried. McCandless called the police and the next morning she was advised by the Chief of Police that her husband had been killed. Mrs. Zachry stated that she received a call from Charlie Bean during the afternoon, was told that if she opened her mouth, "she would get it too" and Bean said that he needed $1,000. She told him that she would leave this amount in her car at Chez Sue Beauty Shop and that she did leave this amount in an envelope in an automobile; when she returned to her car, the money was gone and she had not since been in contact with Charlie Bean.[1]

---

[1]In a second confession, written by Mrs. Zachry on February 1 and 2, she went into much greater detail (26 pages), and with reference to the $1,-000.00, she stated that she had given it to her mother to give to Bean. She also stated in this second confession, and contended on trial, that her mother, Mrs. Bessie Tolleson, had instigated the plan to murder Zachry, and that her own subsequent statements were attempts to "cover" for her mother. However, she could not give any reason why her mother would have wanted Zachry killed. In addition, she said in both the second statement, and at the trial, that Bean intimidated her into silence by threatening to kill her and the children.

At the trial, the state also produced witnesses whose testimony confirmed appellant's statement about payments to Lindsey and Bean. Bill Brown, President of the Bank of Ashdown, testified that appellant borrowed $2,000.00 from his bank on October 29, 1974, taking the proceeds in cash. Ms. Mary Lou Moore, an employee of First Federal Savings and Loan Association in Ashdown, testified that on the same date appellant made a withdrawal of $3,244.55, taking the proceeds in the form of two checks only after being informed that she could not have them in cash. Likewise, the $200.00 check, endorsed and apparently cashed by Charles Bean's wife, Frances Bean, was introduced; an officer of the Ashdown bank testified that after it had been cashed appellant came to the bank and picked it up personally, rather than letting it clear through normal channels.

William ("Big Bill") Lumpkin, Sr., also testified for the state. Lumpkin said that appellant asked him, in December 1974, to kill her husband or to find someone who would do so, offering him a total of $5,000.00. Lumpkin stated that he told appellant "I would see if I could find someone." Lumpkin also testified that appellant told him that she had paid Monroe Lindsey $5,000.00.

The state's chief witness was Charles Watson Bean, the admitted killer of appellant's husband. Bean was arrested on January 21, 1975, and gave his statement to police that day. At the trial, Bean testified that he met appellant in December 1974, near her house, and that appellant told him that she had paid Lindsey $5,000.00 to "do it," but that Lindsey was not going to "do it." Bean stated that he "told her that I would see if I could get it done for her," and that she told him "to proceed to do it immediately." Bean "was to be paid $5,000.00." He said that he and appellant had other meetings to discuss the planned killing, and that appellant even offered to let him kill Zachry in their home, showing Bean through the house, but Bean said that he told her "there was no way that it could happen with children there or in the house. And she said she would try to make arrangements to have the children at her mother's house, and at this time, it was beginning to be urgent — just wanted it to happen that night." According to Bean, "Dianne kept asking that it just happen as soon as possible."

Bean testified that he requested Jimmy Lee Dyas to help him kill Zachry, but that when appellant could not pay the $5,000.00 before the murder occurred, he and Dyas agreed to go ahead and carry out the "contract" for $10,000.00 to be paid after Zachry's death. When Bean met again with appellant, he "asked her that if she would give me $100.00, then that would more or less close the deal and would involve her as well as me in case she decided to put me on the spot. After she had paid $100.00, she would have been as involved as much as I would. She didn't have a hundred dollars on her, so she said, 'I can give you a $200.00 check.'" At Bean's request, Mrs. Zachry made the check out to her mother, Mrs. Tolleson, who then endorsed it. Bean testified positively that appellant never indicated that the $200.00 was a payment to abandon the killing, but to the contrary she was anxious for the plan to be carried out, stating at one point that if Bean did not hurry and do it, she would kill Zachry herself.

Bean stated that he and Dyas drove to appellant's house on the afternoon of January 8; sitting in a car in appellant's driveway, they had just begun to converse with appellant about their plans when "she noticed that her father-in-law was over at the place of business just east of her house . . . . she asked that we leave that he would probably come in there and we did meet him halfway out of the driveway." (The state also called the father-in-law, Loyce Zachry, who testified that he saw Bean and Dyas at appellant's house on January 8; when he asked her who the men were, appellant told him "that's two tile men from Texarkana" looking for her husband, and "then she changed the subject right quick.") Bean said that in this conversation they told appellant " we were going to try to do it that night"; at no time did appellant ever ask them not to kill her husband. Bean also stated that appellant told him and Dyas that her husband "usually carried a lot of money on him and that she wanted it to look like robbery or thought that would be the best thing and that we were to keep his rings if that were true as part-payment of doing it."

Continuing with his testimony, Bean said that he and Dyas drove in Dyas' automobile, to the Zachry home on the night of January 8, and persuaded Zachry to accompany them by pretending interest in buying some real estate listed

with Zachry's agency. After driving to a remote location in Little River County, one of the men told Zachry to empty his pockets, that he was being robbed, and then asked him to get out of the car. Bean said that both he and Dyas were armed, but that Zachry charged at him; in the scuffle Bean emptied his pistol into Zachry. After the fight he shot Zachry one more time, with Dyas' pistol. The men then took Zachry's jewelry and money and drove back toward Texarkana. They stopped once, Bean said, when he called appellant and "told her we had done what we agreed to do and she asked me how long it would be before she should notify them and I told her just to use her own judgment."

Bean said that he called appellant several days after the killing "and asked her when she was going to have some money for us, and she said she would have $1,000.00 for us if that was all right." Bean later met appellant's mother at a Texarkana K-Mart store and received a thousand dollars in cash in an envelope. Bean lost $200.00 of this payment, which apparently fell from the envelope in his car, but he split the remaining $800.00 with Dyas. (The state produced a witness, Bill Brown, President of the Bank of Ashdown, who corroborated that appellant had given his bank a note for $1,-500.00 on January 16, 1975, putting the proceeds in her checking account; on the same day appellant wrote and cashed an $850.00 check in a Texarkana bank.)

McCandless, after receiving the call from appellant that her husband was missing, with a man named Eddie Woodruff, began a search for Zachry. Appellant had also called Albert C. Moore, owner of a fishing camp near the scene of the killing, telling him that her husband had been gone for 18 hours, that she was uneasy about him, and according to Moore, asked him to check around camp to see if he had been down there. Moore discovered the body early on the morning of January 9. It is apparent that the evidence offered by the state was more than sufficient to justify the jury in reaching its conclusions.

It is asserted that the court erred in admitting into evidence the statement referred to under Point 1, said statement being a violation of her constitutional rights. We do not agree. The trial court held extensive hearings on the ad-

missibility of this statement, given by appellant at the Texarkana police station on January 21 and written down by state policeman James Lester, and ruled that it was admissible. Appellant's version of the events that transpired before and during the time the statement was given conflicted with the testimony of every other witness, and was not corroborated by any other witness. Appellant's attack on the voluntariness of the statement is based on allegations that an unknown police officer at the station told her that she might be prosecuted only as an "accessory," which she interpreted to indicate some lesser degree of culpability; that she was not advised of her constitutional rights until after she gave the statement, and that she was under the influence of drugs when the statement was given.

Sheriff Marlin Surber, who took appellant to the station, testified that he stayed with appellant during most of the time that she waited for questioning (a period that he estimated as no more than 30 minutes), and that he never heard anyone mention the term, "accessory," to appellant. Appellant herself testified only that she was listening to a conversation among some unidentified officers, and "I asked when I overheard the conversation if we were being charged with an accessory, and he said, 'Yes, ma'am, I believe so.'" Appellant also stated that she had gone to a doctor the previous night, and had received a shot and some pills to help her relax, and that she was still "drunk" from this medication when she gave the statement the next day. No doctor corroborated this statement, nor was there any testimony about the identity of the drugs in question or their effects.

Both James Lester and Danny Sewell, the interrogating officers, testified that appellant was fully apprised of her constitutional rights before the statement was given, and that they also told her that she was a suspect in the homicide. Appellant signed a rights form, introduced at the hearing, that shows that the officers informed her of her rights at 10:30 A.M., before the statement was taken. Neither of the officers noticed anything abnormal about appellant's condition, and both testified that she became upset only when they told her at the beginning of the interview that she was a suspect. Lester and Sewell also said that appellant never asked for an attorney, and that she never indicated that she wanted the

questioning to cease.

The statement itself shows that it was taken in an interview that began at 10:30 A.M. and concluded at 11:45 A.M. and was signed by appellant, who initialed each page and every correction. Appellant herself admitted that the statement accurately reflected what she told the officers.

In reviewing a trial court's ruling on the admissibility of a statement by a defendant, this court makes an independent determination based on the totality of the evidence, but reverses the trial court only when its ruling is clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 515. There is no question but that the preponderance of the evidence sustains the trial court's decision.

Appellant asserts that the state's case rested wholly on the testimony of two accomplices, Charles Bean and Bill Lumpkin, and that the state failed to adduce sufficient independent evidence to sustain appellant's conviction. This point obviously repeats appellant's first contention, that the evidence was insufficient, and does not merit extended discussion.

In the instant case, as appellee points out, the state presented undisputed proof that the crime was committed, establishing the *corpus delecti.* Appellant made a voluntary statement on January 21, identifying herself as the perpetrator of the plan to kill Zachry, and detailing the circumstances under which she acquiesced as her husband left their home on January 8 with Bean and Dyas. The state documented the bank transactions by which appellant obtained the sums of money involved in the scheme. Zachry's father testified that he saw appellant talking with two men on the afternoon of the day of the killing, and further stated that when he asked about the men, appellant said they were two "tile" men and quickly changed the subject.[2] After the killing, appellant called Moore, who lived in the area where she knew that Bean and Dyas has taken her husband, and asked him to look for Zachry in that area. She also told the sheriff

---

[2]The witness subsequently identified the two men as Bean and Dyas.

that she thought her husband had been robbed, but she made absolutely no mention of Bean, Dyas or Monroe Lindsey.

The applicable rule of law is well established. "The test of sufficiency of corroboration has been stated to be whether, if the testimony of the accomplice is eliminated from the case, the testimony of the other witnesses be sufficient to establish the commission of the offense and the connection of the accused therewith." *Prather v. State,* 256 Ark. 581, 509 S.W. 2d 309. There is no question in this case but that the state presented sufficient evidence to establish the commission of the offense, and appellant's connection therewith, even if the testimony of Lumpkin and Bean is eliminated.[3]

It is asserted that "The Court Erred In Permitting The State, Over Appellant's Objection, To Cross-Examine The Defendant-Appellant From A Statement Illegally And Unconstitutionally Obtained and Ruled Inadmissible."

Appellant, while confined in the Howard County Jail, also wrote a 26 page narrative statement (previously mentioned in a footnote) on February 1-2, 1975. Although the trial court held that this statement was also admissible, the state elected not to use it in its case-in-chief. When appellant testified in her own defense, however, the trial court permitted the prosecuting attorney to cross-examine appellant about the February 1-2 statement, as a prior inconsistent statement, and afforded appellant an opportunity to explain any discrepancies. The trial court refused to allow the prosecuting attorney to introduce the entire statement at that point because the state had rested its case without proffering it.

It should first be noted that under the standard of *Degler v. State, supra,* the February 1-2 statement does not appear to be inadmissible. Appellant testified that she wrote the statement only because she received promises of leniency and

---

[3]Actually, with respect to Lumpkin, it is questionable that he was an "accomplice." The record does not reveal that he was charged with any offense, nor does it indicate that he committed any overt act toward carrying out a conspiracy. This court pointed out in *Johnson and Keeling v. State,* 259 Ark. 773 (1976), "the burden is on the defendant to show that a witness is an accomplice."

favorable treatment from a state policeman at the Howard County jail, but the policeman, Sergeant Carroll Page, denied that he had made any promises. The trial court's decision that the statement was voluntary does not appear contrary to the preponderance of the evidence. Of course, no error could arise from cross-examination about an admissible statement.

Even if it is conceded, *arguendo,* that the statement was involuntary and inadmissible, this court has previously rejected a contention identical to appellant's argument, in *Rooks* v. *State,* 250 Ark. 561, 466 S.W. 2d 478, a decision premised on *Harris* v. *New York,* 401 U.S. 222. Therefore, even if the statement had been inadmissible, the trial court committed no error by permitting the state to use it in cross-examining appellant.

It is next contended that the court erred in refusing to give appellant's requested instruction on conspiracy.

Appellant requested an instruction, refused by the trial court, that stated a conspiracy to commit a felony is only a misdemeanor if the conspirators do not commit the felony. The proffered instruction followed the language of Ark. Stat. Ann. § 41-1201 (Repl. 1964). Appellant now contends that the refusal to give this instruction was error, since appellant's "defense in part to the charge filed against her by the State concerned her withdrawal from any conspiracy prior to the death of her husband."

The trial court correctly refused the instruction. In its interpretation of the statute that is now codified as § 41-1201, on which appellant relies for this instruction, this court held that the statute makes a conspiracy a prosecutable misdemeanor *only* when the object of the conspiracy is not accomplished. When the purpose of the conspiracy is achieved — as it was in the instant case — then the conspiracy is merged in the greater offense, and § 41-1201 becomes inapplicable. *Elsey* v. *State,* 47 Ark. 572, 2 S.W. 337. Appellant's requested instruction was, therefore, an incorrect statement of the law with regard to the facts of this case, and the trial court committed no error by rejecting it.

It is next urged that since the office of State Police Sergeant Carroll Page at the Howard County jail was "bugged," appellant was denied privileged and confidential communications with her attorneys.

Before the trial, appellant's counsel discovered a hidden microphone leading to a recording device in a desk in a room at the Howard County jail. In this room appellant and counsel had held several conferences. Appellant moved to dismiss the information against her, alleging that the illegal electronic surveillance vitiated all criminal proceedings to that point. At a hearing on this motion, Sergeant Page, who owned the equipment, testified that he used it solely to record statements from victims and witnesses who might be afraid to talk before an open recorder; Page also stated that the equipment had never been used in connection with appellant's case. Moreover, appellant's counsel admitted that no one forced him to use the room in which the equipment was located; that the machine was not in operation when he discovered it, and that he had no evidence that it had ever been used to record a conference between him and appellant. Actually, it is not contended that any conversations were "bugged." At any rate, the record contains not one scintilla of evidence that any type of electronic surveillance was ever conducted in this case. Accordingly, appellant's contention that she was denied privileged and confidential communications with her attorneys is without merit.

Finally, it is vigorously urged that the state made deals with Bean and Lumpkin, and refused to disclose same at appellant's trial, which was "illegally prejudiced."

It might first be stated that Lumpkin is not even mentioned in appellant's argument at all, and there are no facts in the record which could, in any way, support such an allegation. The argument is all directed to a so-called "deal" with Bean. While appellant argues that there was a "deal" which was not disclosed to the jury, the record is contrary to such an assertion. Bean testified that he had been told by the prosecuting attorney that if he testified in behalf of the state, this fact would be taken into consideration, but he was also told that under no circumstances would the prosecutor ever recommend that he receive less than life imprisonment. The

witness also emphatically stated that he had never been promised that he would not be sent to the electric chair. The transcript contains five and one-half pages relating to this matter, including statements by counsel for the defense and the state, and a vigorous cross-examination of the witness by appellant's attorney. *The entire proceeding took place in front of the jury,* so there certainly is nothing to the argument that the jury was not informed of any inducements made to Bean. As already stated, the only actual inducement appearing in the record is that Bean was told that his willingness to testify would be taken into consideration. Of course, the credibility of a witness is a matter for the jury to pass upon, and since the jury heard the entire discussion and testimony relating to a so-called "deal," we can see no possible prejudice.

Appellant filed notice of appeal, and 41 days (according to appellant) after Mrs. Zachry's conviction, Bean pleaded guilty to first degree murder and was sentenced to life imprisonment. Thereafter, appellant filed a motion with this court asking that a supplemental record of the proceedings held on the day Bean pleaded guilty be ordered included in the transcript on his appeal. We denied this motion, but granted an alternate motion for appellant to file an out-of-time motion for a new trial. This motion was denied and such denial of this motion is also included in this appeal.

After reviewing the proceedings of the sentencing of Bean, we agree with the trial court that there is "nothing inconsistent between the transcript filed in this [main] case and the [transcript of] sentencing of Charles Watson Bean." That is, there is nothing to substantiate appellant's contention that Bean, at the time he testified, had been promised that the death penalty would not be sought, or that he would receive no more than life imprisonment. This court observed, in *McDonald* v. *State,* 249 Ark. 506, 459 S.W. 2d 806, that an inducement to testify, even if one is shown, "does not affect the competency of [the witness's] testimony, for we have held that it goes only to the witness's credibility." The federal courts have reached the same result. In *United States* v. *Vida,* 370 F. 2d 759 (6th Cir.), *cert. denied,* 387 U.S. 910, a similar argument was rejected when the court stated that it was not impressed with the contention "that the use of the testimony of an unsentenced accomplice deprives one who stands trial

of due process or fair treatment. [Citations omitted.] We find no disagreement with the text that 'the fact that a witness hopes or expects that he will secure a mitigation of his own punishment by testifying on behalf of the prosecution does not disqualify him.' " See also *United States* v. *Brill,* 350 F. 2d 171 (2d Cir.), *cert. denied,* 382 U.S. 973. In the words of the United States Supreme Court, in *Lisenba* v. *California,* 314 U.S. 219, "[t]here is no adequate showing that there was a corrupt bargain with [the witness], and the practice of taking into consideration, in sentencing an accomplice, his aid to the State in turning state's evidence can be no denial of due process to a convicted confederate."

As already set out, the jury heard every contention relative to a "deal" advanced by appellant at the time of trial and apparently concluded that the assurance given to Bean that the fact he testified would be given consideration, did not impair his credibility.

We have also examined the record for every objection made, and find no reversible error.

Affirmed.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I concur, but base my agreement on the sustaining of the motion for a new trial on a different basis from that of the majority opinion. The trial court properly held that the motion for new trial should be denied because it was not timely filed. This was jurisdictional. I agree with the trial court, as evidenced by my dissenting opinion to the granting of appellant's motion to be permitted to file the motion for new trial. See *Zachry* v. *State,* 259 Ark. 42B. This jurisdictional defect cannot be cured by this court's "reinvesting jurisdiction."