Patricia HENDRICKSON *v.* STATE of Arkansas

CR 84-164                                   688 S.W.2d 295

Supreme Court of Arkansas
Opinion delivered April 29, 1985

*Mathis & Childers,* for appellant.

*Steve Clark,* Att'y Gen., by: *Michael E. Wheeler,* Asst. Att'y. Gen., for appellee.

ROBERT H. DUDLEY, Justice. The appellant, Patricia Hendrickson, stands convicted of capital felony murder. The State contends that appellant conspired with Norma Foster, a college dormitory housemother at Ouachita Baptist University, and Mark Yarbrough, a student, to hire Howard Vagi, another student, to kill her husband for $16,000.00. Vagi did in fact murder appellant's husband and, upon a plea agreement, received a life sentence. Yarbrough was granted immunity from prosecution in return for his testimony. Norma Foster was convicted of first degree murder and was sentenced to life. Her conviction has recently been reversed. *Foster* v. *State,* 285 Ark. 363, 687 S.W.2d 829 (1985). We also reverse this case and remand for a new trial. Jurisdiction of this death penalty case is in this Court. Rule 29(1)(b).

Appellant's first assignment of error is that the trial judge erred in denying her motion to suppress her inculpatory statement. The contention is meritorious. Prior to her being charged in this case, appellant's personal attorney was W. H. "Dub" Arnold. In addition, he also represented her in her capacities as personal representative of her deceased husband's estate and guardian of her son's estate. She testified that she frequently consulted with Arnold as her attorney in one capacity or another. Arnold also serves as Prosecuting Attorney of the district having venue in this case. Immediately before appellant was interrogated, Arnold told the police that he did not want to see appellant, and that

he could no longer personally represent her. While the officers were reading appellant's *Miranda* rights to her, she stated that she wanted "to talk to Dub." The interrogating officers knew the response meant that appellant wanted to speak to her attorney but they had been told by Arnold that he could not represent her. Instead of terminating the questioning at that point, the officers told her that Arnold was not there and he could not represent her. She subsequently executed a waiver of her *Miranda* rights and gave the inculpatory statement.

In *Smith v. Illinois,* 105 S.Ct. 490 (1984), the Supreme Court clearly set forth the twofold test we are to apply in the situation before us:

> An accused in custody, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him," unless he validly waives his earlier request for the assistance of counsel. *Edwards* v. *Arizona,* 451 U.S., at 484-485, 101 S.Ct., at 1885. This "rigid" prophylactic rule, *Fare* v. *Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979), embodies two distinct inquiries. First, courts must determine whether the accused actually invoked his right to counsel. See, *e.g., Edwards* v. *Arizona, supra,* 451 U.S., at 484-485, 101 S.Ct., at 1884-1885 (whether accused "expressed his desire" for, or "clearly asserted" his right to, the assistance of counsel); *Miranda* v. *Arizona,* 384 U.S., at 444-445, 86 S.Ct., at 1612 (whether accused "indicate[d] in any manner and at any stage of the process that he wish[ed] to consult with an attorney before speaking"). Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards* v. *Arizona, supra,* 451 U.S., at 485, 486, n. 9, 101 S.Ct., at 1885, n. 9.

The threshold inquiry is whether appellant invoked her right to counsel in the first instance. Some courts have

held that all questioning must cease upon any request for or reference to counsel, however equivocal or ambiguous. See, *e.g., Ochoa* v. *State,* 573 S.W.2d 796, 800-801 (Tex. Crim. App. 1978). Others have attempted to define a threshold standard of clarity for such requests, and have held that requests falling below this threshold do not trigger the right to counsel. See, *e.g., People* v. *Krueger,* 412 N.E.2d 537, 540 (1980) ("[A]n assertion of the right to counsel need not be explicit, unequivocal, or made with unmistakable clarity," but not "every reference to an attorney, no matter how vague, indecisive or ambiguous, should constitute an invocation of the right to counsel"), *cert. den.,* 451 U.S. 1019, 1981. Still others have adopted a third approach, holding that when an accused makes an equivocal statement that "arguably" can be construed as a request for counsel, all interrogation must immediately cease except for narrow questions designed to "clarify" the earlier statement and the accused's desires respecting counsel. See, *e.g., Thompson* v. *Wainwright,* 601 F.2d 768, 771-772 (5th Cir. 1979); *State* v. *Moulds,* 105 Idaho 880, 888, 673 P.2d 1074, 1082 (App. 1983). The Supreme Court has not ruled on the matter.

We need not choose between these standards in the instant case because appellant's statement was neither vague not indecisive. She unequivocally asked to speak to "Dub", who was her attorney.

Invocation of the right of counsel and waiver are entirely distinct inquiries. Once the right is invoked, a valid waiver cannot be established by showing only that the accused responded to further police-initiated custodial interrogation. *Edwards* v. *Arizona,* 451 U.S. 477, at 484 (1981). Therefore, the trial court erred in not suppressing the statement.

Because we reverse and remand for a new trial, we answer those assignments of error which are likely to arise again upon retrial.

Prior to trial, appellant filed a motion asking that the state be prohibited from "death qualifying" the jury and from challenging for cause those jurors who expressed

conscientious opposition to capital punishment. The trial court, relying upon our decision in *Rector* v. *State*, 280 Ark. 385, 659 S.W.2d 168 (1983), correctly refused to grant the motion and, upon retrial, should again refuse to grant the motion. The appellant urges us to abandon our position taken in *Rector, supra,* and adopt the position taken later by the Eighth Circuit Court of Appeals in *Grigsby* v. *Mabry,* 758 F.2d 226 (1985). While we have great respect for the opinions of the Eighth Circuit, we decline to change our position. Other Circuit Courts of Appeal which have considered the issue have ruled the same as we have. See *Keeton* v. *Garrison,* 742 F.2d 129 (4th Cir. 1984); *Smith* v. *Balkcom,* 660 F.2d 573 (5th Cir. 1981). The Supreme Court of the United States has not yet ruled on the issue, but may soon grant certiorari to resolve the dispute between circuits since it is a matter of significant public interest.

Next, upon remand, the trial court should again allow Mark Yarbrough to testify about statements by Norma Foster in furtherance of the conspiracy. The case of *Spears, Cassell & Bumgarner* v. *State,* 280 Ark. 577, 660 S.W.2d 913 (1983) is dispositive of this issue. Rule 801(d)(2)(v) of the Ark. Unif. Rules of Evid., Ark. Stat. Ann. § 28-1001 (Repl. 1979) provides that testimony about an out-of-court statement by a co-conspirator during the course and in furtherance of a conspiracy is not hearsay. *Id.* at 584. Thus, Yarbrough's testimony about statements by Norma Foster was properly admissible.

Also, the trial court should again exclude from the penalty phase of the trial the results of a polygraph examination given to appellant. The rules of evidence are not applicable to the penalty phase of the trial. See Ark. Stat. Ann. § 41-1301(4) (Repl. 1977) and *Hobbs* v. *State,* 273 Ark. 125, 617 S.W.2d 347 (1981). However, the evidence offered must be probative of some issue to be properly considered in the penalty phase. The proffered test results were not probative of any issue in the penalty phase.

If the appellant, upon retrial, is again sentenced to death the trial court should again reject appellant's

argument that the death sentence is disproportionate in this case. It is true that the one who pulled the trigger is serving only a life sentence, but he was a young college student, while the appellant was a mature adult and, under the proof, the procuring cause of the murder. There was evidence that appellant entered into the contract to have her husband killed for a financial gain of over $600,000.00. The death sentence is not disproportionate under the circumstances of the case. In addition, there is sufficient evidence of aggravating circumstances.

Appellant argues other points but they are not likely to arise again, and therefore, we do not address them.

Reversed and remanded.

HOLT, C.J., HICKMAN and PURTLE, JJ., concur.

HAYS, J., dissents.

DARRELL HICKMAN, Justice, concurring. The majority opinion states that the interrogating officers "knew" the appellant wanted to speak to her lawyer, as counsel, thus invoking her rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). That is not entirely correct. They did concede, and it is not disputed, that she asked to see "Dub". However, the question is whether she meant she wanted to talk to her lawyer, get his advice, and have him present, or to merely discuss her charges with the prosecuting attorney. Did she want to apologize for any embarrassment it might cause the prosecutor since he had acted as her attorney and knew her and her husband socially? There was considerable testimony regarding these questions. In my judgment the totality of the circumstances leads me to conclude that she was invoking her right to counsel. Considering the circumstances, her statement undoubtedly could have been interpreted by the officers as an invocation of her right to counsel. The officers did not, however, admit that they understood it that way. On its face, the statement "I want to talk to Dub" would not, as a matter of law, be a clear and unequivocal assertion of her right to counsel. However, "I want to talk to Dub, my lawyer, before answering your question" would be such an assertion.

When the burden of the state and the totality of the circumstances are considered, the police should not have proceeded further without inquiring if indeed she wanted a lawyer, or merely "to talk to Dub." Clearly, there is a difference.

HOLT, C.J., joins in the concurrence.

JOHN I. PURTLE, Justice, concurring. I concur with the result but would also instruct the trial court on the matter of selecting a "death qualified" trial jury and on matters relating to the sentencing phase at the next trial.

First, it is, in my opinion, a stubborn, useless and expensive act to stand on the majority opinion as written in *Rector v. State*, 280 Ark. 385, 659 S.W.2d 168 (1983). The Eighth Circuit Court of Appeals has soundly pointed out the infirmities of our *Rector* opinion in *Grigsby v. Mabry*, 758 F.2d 226 (1985). Although there is a possibility the United States Supreme Court will reverse *Grigsby*, there is the possibility it will affirm. In the meantime we should follow *Grigsby* not only because it is the law, but also because it is fair and just. I feel there is very little difference in this court's real standing on "death qualified" juries and the criteria established in *Grigsby*.

Both *Rector* and *Grigsby* have common language in part and both rely on some of the same authorities. For example both quote from *Needham v. State*, 215 Ark. 935, 224 S.W.2d 785 (1949). *Grigsby* cited with approval the concurring opinion in *Rector* where it was stated:

> The majority correctly states that persons who are unalterably opposed to the imposition of the death penalty should be excluded and I agree. I think *Witherspoon* is in accord with this view. The mistake made in some trial courts is in excluding persons who have moral or religious scruples against the death penalty but who would agree to impose it if the law and the circumstances warrant it in the case being tried. *Witherspoon* never intended to exclude this type juror. Neither did it indicate that only those who favored the

death penalty should comprise trial juries. I think the correct procedure on this controversial issue lies somewhere between excluding prospective jurors who have scruples against the death sentence and including only those who have no scruples against imposing such a penalty.

I have never thought that all or even most people who favor the death penalty are barbarians in modern society. However, I do feel that a jury composed of only such persons is not representative of any community. Neither would a jury composed only of those having scruples against the death penalty represent the community. The selection of jurors should not favor the accused nor should it favor the state. A properly selected jury enters upon its duties slanted toward neither side. Thus selected, it would not be proper to refer to the jury as a death qualified one.

I fully believe the results of the polygraph test of the appellant should be allowed in the penalty phase of the trial. There can be no doubt that the present law allows the use of such evidence at the sentencing stage of the trial. Ark. Stat. Ann. § 41-1301 (4) (Repl. 1977) reads in part:

Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trial of criminal matters. . . .

We held, in reversing the conviction in *Hobbs* v. *State,* 273 Ark. 125, 617 S.W.2d 347 (1981), that in the sentencing phase, evidence of mitigating circumstances should be admitted if it is made under oath and the state has an opportunity to cross examine the witness. Both requirements are met in the case here under review. We stated in *Ford* v. *State,* 276 Ark. 98, 633 S.W.2d 3 (1982): "If there is any evidence of aggravating or mitigating circumstances, however slight, the matter should be submitted to the jury."