Patricia HENDRICKSON *v.* STATE of Arkansas

CR 86-119                                    719 S.W.2d 420

Supreme Court of Arkansas
Opinion delivered November 17, 1986

*Mathis & Mathis*, for appellant.

*Steve Clark*, Att'y Gen., by: *Robert A. Ginnaven, III*, Asst. Att'y Gen., for appellee.

GEORGE ROSE SMITH, Justice. The appellant, Patricia Hendrickson, was charged with capital murder in that she conspired with Norma Foster and Mark Yarbrough, a college student, to hire a second student, Howard Vagi, to murder the appellant's husband, Orin Hendrickson, for $16,000. At the appellant's first trial she was found guilty and sentenced to death. We reversed that conviction because the State was allowed to introduce a statement that the police had taken from her immediately after she had been warned of her rights and had said that she wanted to talk to her lawyer. *Hendrickson v. State*, 285 Ark. 462, 688 S.W.2d 295 (1985). Upon a retrial she was again found guilty of capital murder and was sentenced to life imprisonment without parole. This appeal is from that conviction.

Yarbrough, one of the students, was the State's principal witness as to the events leading up to the crime. He had known Norma Foster, a college house mother, and through her had come to know the appellant. He testified that Norma approached him about arranging a killing. He mentioned it to Vagi, who wanted to do it for the money. The crime was planned in detail. The appellant supplied a picture of her husband and a key to the Hendricksons' house. She made a down payment of $5,000 or more. Yarbrough showed the house to Vagi.

Vagi, who entered a negotiated plea in return for a life sentence, testified about the crime itself. He bought a shotgun. On the afternoon of the murder he went to the house, entering with the key. He waited until Hendrickson came home in the evening. After Hendrickson entered the kitchen through a door from the garage, Vagi shot him in the chest, as he had been instructed to do. Hendrickson fell to the floor. Vagi then ransacked drawers to create the appearance of a robbery. He thought the victim might

still be alive and shot him a second time. After that he left the house. The appellant had been in Hot Springs that afternoon. She and Norma found the body when they went to the house together. The police were notified. The facts were eventually discovered. The informations were filed about eight months after the homicide.

It is first argued that two photographs of the victim's body, clothed and lying face down on the kitchen floor in an extensive area of blood, should not have been introduced by the State. The medical examiner had already testified about the cause of death and had presented two pictures taken after the body had been cleaned. Both pictures are of the upper part of the body. One, taken from the front, shows the entry points of the two shots. The other, taken from the back, shows small spots where pellets left the body.

There was no objection to the pictures taken by the medical examiner, but it is argued that the prejudicial effect of the two pictures of the body on the floor outweighed whatever probative value they might have. The point is made that the cause of death had already been proved, so the pictures were not needed to establish that fact. We have held that it is immaterial that photographs are cumulative to other evidence. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982). Here the two photographs corroborate Vagi's account of the crime. We do not regard them as being especially inflammatory, but even if they were, their admissibility would still be a matter lying within the trial court's discretion. *Fairchild* v. *State*, 284 Ark. 289, 681 S.W.2d 380 (1984), cert. denied, 105 S. Ct. 2346 (1985). Here we find no abuse of discretion.

The appellant's second argument is that the court was wrong in ruling that the appellant's statement to the police, although inadmissible as evidence during the State's case in chief, could nevertheless be used by the prosecuting attorney in cross-examination of a defense witness, Dr. Stevens.

We hold that the trial court's ruling was right, but the facts must be examined in some detail. About eight months after the crime was committed, the police obtained from the appellant an inculpatory statement, which was recorded on tape. That is the statement we found to be inadmissible on the first appeal. In that

statement the appellant admitted having planned the murder, having supplied the photograph of her husband and the key to the house, and having paid $5,000 to Yarbrough as a down payment. She said that when she arrived at the house that night with Norma she did not know "for sure" that her husband was dead. At the first trial she testified in her own defense. She denied any complicity in the crime, saying that the various witnesses who testified to her connection with the killing were lying. She did not testify at the second trial.

Dr. Stevens, a psychologist, was called as a defense witness at the second trial. He said he had consulted with Mrs. Hendrickson four times, all while she was confined. The first interview occurred in August after we had reversed the conviction in April. The interviews were conducted at the request of the defense counsel. In addition to talking with the appellant Dr. Stevens administered several tests, which he described. He found her IQ to be 81, which is well below average. He doubted if she could compete at the college level. He said she does not have a dominant personality. She tends to be "a very feminine, mousey, passive, dependent kind of person who would be expected to be very easily led." He thought her to be open and straightforward in talking about situations.

Toward the end of his direct examination he was asked about Mrs. Hendrickson's knowledge of events immediately before and after her husband's death. He said she could remember the activities of that day up until the time she found him, but from that point on her memory was very sketchy for months afterwards. He said she had no memory about having been incarcerated in certain places and could give him no information about it. The doctor's direct examination ended in this manner:

Q. Doctor, did you make a determination as to whether she had any guilty knowledge in connection with the death of Orin Hendrickson?

A. I did. It was my determination that she does not have.

The prosecutor, before undertaking any cross-examination, argued in chambers that defense counsel should make the defendant herself available for cross-examination. The court

disallowed that, but ruled that the prosecutor could take the defendant's statements from the transcript of the first trial and question the witness about that information. Defense counsel then announced that Dr. Stevens was withdrawn as a witness, because the court had ruled that he could be cross-examined about the defendant's statement to the police and about her testimony at the first trial. The court instructed the jury not to consider any of Dr. Steven's testimony.

Counsel argue that when the court ruled as it did, the defendant had to withdraw Dr. Stevens as a witness or submit to the introduction of inadmissible evidence. "This ruling, in effect, would have denied the Defendant her right not to take the witness stand."

We disagree. Although the Supreme Court has not decided the question in the fact situation now before us, we interpret its decisions to mean that the proposed cross-examination would have been permissible.

The first relevant Supreme Court case was decided back in 1954, twelve years before the *Miranda* rules were announced. *Walder* v. *United States*, 347 U.S. 62 (1954). There the trial court sustained Walder's motion to suppress a heroin capsule because it had been obtained by an unlawful search and seizure. When Walder was tried upon charges arising from four other illicit drug transactions, he testified that he had never sold or possessed narcotics in his life. The Government then questioned him about the capsule; he denied that narcotics had been taken from him. The Government called as witnesses an officer who had participated in the search and the chemist who had analyzed the heroin capsule. The trial judge admitted the testimony, but instructed the jury that the evidence was to be considered only as impeaching the defendant's testimony, not as to his guilt. The Supreme Court upheld the trial judge's ruling, saying:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

. . . Of course, the Constitution guarantees a defendant the fullest opportunity to meet the accusation against him. He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.

The *Walder* case has been steadfastly adhered to by the Court. In *Harris* v. *New York*, 401 U.S. 222 (1971), a statement made by the defendant to the police was held by the trial court to be inadmissible under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). When the defendant took the stand and denied having made drug sales, the trial court allowed him to be cross-examined about the questions and answers in the suppressed statement. The Supreme Court sustained that ruling, in language particularly applicable to our present case:

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations.] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment. 401 U.S. at 225.

The last sentence in the quotation is directly applicable to the case at bar. Here the inconsistent statements were made to a third person, Dr. Stevens. It was therefore proper to use appellant's prior statements and testimony for the cross-examination and impeachment of Dr. Stevens.

■ We have followed the *Harris* principle in three cases. *Zachry* v. *State*, 260 Ark. 97, 538 S.W.2d 25 (1976); *Williams* v. *State*, 258 Ark. 207, 523 S.W.2d 377 (1975); *Rooks* v. *State*, 250 Ark. 561, 466 S.W.2d 478 (1971). We did not, however, have the

benefit of the later Supreme Court opinions and consequently mentioned a footnote in *Harris* to the effect that the voluntariness of the defendant's confession is not material to its use as a basis for cross-examination. Our prior opinions are modified to the extent of forbidding the use of involuntary statements.

The Supreme Court again stated the *Harris* principles in *Oregon* v. *Hass*, 420 U.S. 714 (1975). That case was like ours in that the officers obtained an inculpatory statement from the suspect after he had asked for a lawyer. In holding that the inadmissible statement could nevertheless be used in the cross-examination of the defendant, the Court included in its opinion two sentences pertinent to the case at bar: "Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." 420 U.S. 722. "The effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth." *Id.*, 723. In *Mincey* v. *Arizona*, 437 U.S. 385 (1978), the Court directly held, as it had implied in earlier opinions, that the prosecution could not use in its cross-examination of the defendant a statement that was not voluntary, having been obtained while the defendant was in a hospital and in no condition to make a statement freely. In the case at bar there is no question about the voluntariness of the appellant's statements to the police. To the contrary, at the *Denno* hearing before the first trial she herself testified that there had been no threats or intimidation.

■ It is perfectly clear that, pursuant to the decisions of the Supreme Court, the prosecutor would have been entitled to use, in cross-examination, Mrs. Hendrickson's statements to the police and her testimony at the first trial if she had taken the stand at the second trial. She exercised her right not to testify. In defending the charge, however, she attempted to inform the jury through Dr. Stevens that she had no guilty knowledge of the crime. Dr. Stevens buttressed his testimony with his professional qualifications and with his statement that Mrs. Hendrickson was "open and straightforward" in her consultations with him.

It is crystal clear, however, that this maneuver to bring

before the jury Mrs. Hendrickson's asserted lack of guilty knowledge cannot be permitted to succeed without affording to the prosecution its right of cross-examination. The crime was committed on March 10, 1983. The appellant made her statements to the police on November 21, more than eight months later. At that time she remembered the details of the homicide. She testified at her first trial in April, 1984, and still remembered the details. After our reversal she consulted Dr. Stevens, apparently to obtain his opinion for its possible use at the second trial. Since Dr. Stevens got all his information from Mrs. Hendrickson herself, she must have suffered or pretended to have suffered sudden lapses of memory between the decision on the first appeal in April and the second trial, which was in the following December. The prosecutor, in his cross-examination, would have been entitled to use the appellant's earlier statements and testimony to impeach the witness by testing the basis for his belief that his patient had no guilty knowledge of the murder. Indeed, it was specifically the threat of that cross-examination that led the defense to withdraw Dr. Stevens as a witness. The court's ruling was correct.

The appellant's third contention is that the evidence is insufficient to support a conviction for capital murder. Here the only argument is that apparently the jury did not give full consideration to the defendant's below-average IQ and to her being a quiet, unaggressive, unassuming, and undemanding person. That, however, is a matter of weighing the evidence, which falls within the province of the jury, not of this court.

This being a life sentence, we have considered all the possible errors that have been brought to our attention by counsel and find no error prejudicial to the appellant.

Affirmed.

NEWBERN, J., concurs.

PURTLE, J., dissents.

DAVID NEWBERN, Justice, concurring. The majority opinion justifies the decision of the trial court to permit cross-examination of Dr. Stevens using Mrs. Hendrickson's clearly inadmissible statement upon *Walder* v. *United States*, 347 U.S. 62 (1954). I do not believe the majority's reliance on that case in

these circumstances is correct.

If the appellant had chosen to testify and had denied participating in the crime or had denied making any statement to the police about it, I believe *Walder* v. *United States, supra*, would have permitted cross-examination based upon her statement. We have adopted its "fight fire with fire" rationale, and I believe appropriately so. *McFadden* v. *State*, 290 Ark. 177, 717 S.W.2d 812 (1986); *Wilburn* v. *State*, 289 Ark. 224, 711 S.W.2d 760 (1986); *Pursley* v. *Price*, 283 Ark. 33, 670 S.W.2d 448 (1984). However, this case presents a different situation. Dr. Stevens' testimony was about his opinion as to the appellant's guilty knowledge, or lack of it, at the time he examined her. The appellant's condition in that respect when she was examined in 1985 by Dr. Stevens may have been different from her condition in 1983 when she was first charged with the offense after having made her inculpatory statement. Rather than fighting fire with fire, as is permitted in our decisions following *Walder* v. *United States, supra*, allowing cross-examination of Dr. Stevens on the basis of the appellant's statement would be more like fighting a lighted match with a conflagration.

We need not reach any such conclusion, for the decision requiring the withdrawal of Dr. Stevens' testimony, particularly after it had been heard by the jury, was not an error of such magnitude as to require reversal in the face of overwhelming evidence of the appellant's guilt. *Thomas* v. *State*, 289 Ark. 72, 709 S.W.2d 83 (1986). I, therefore, concur in the result reached by the majority opinion.

JOHN I. PURTLE, Justice, dissenting. I respectfully dissent from the part of the majority opinion which approves the cross-examination of a third-party witness with an involuntary statement made by the appellant. This same statement was ruled inadmissible and was the sole basis for reversal of the conviction in the first trial. See *Hendrickson* v. *State*, 285 Ark. 462, 688 S.W.2d 295 (1985). At the second trial the appellant called a treating psychologist who stated that the appellant could not recall the events of the day her husband was murdered and that her memory for several months thereafter was sketchy. The witness was asked by the defense attorney whether the appellant had any guilty knowledge in connection with her husband's

death. It was the opinion of the expert witness that the appellant did not have such knowledge. The court ruled at this point that the psychologist could be cross-examined by the prosecutor with the involuntary statement given by the appellant after invoking her right to counsel.

The effect of the majority's holding is to allow the statement, which was inculpatory, to be introduced at a second trial under the guise of cross-examination of a witness other than the declarant of the statement. Under this theory an involuntary, custodial statement is admissible so long as it is laundered through a first trial and then used by the prosecution to impeach a witness other than the accused at a subsequent trial. I must also point out that during the direct examination the psychologist was not asked one word concerning what the appellant had told him. He was asked only to give his opinion as to her guilty knowledge.

The reason the parties and the majority opinion fail to supply precedent is that there is none. All the cases cited in the majority opinion are cases where the accused took the stand at the trial and the prior inconsistent statement *of the defendant* was used to impeach *the defendant*. The reason for lack of precedent for this fact situation is that it is very likely that trial courts have refused to allow cross-examination of one witness with the prior statement of another person, given out of the presence of the testifying witness.

In *Harris* v. *New York*, 401 U.S. 222 (1971), the Supreme Court stated: "Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately." In *Walder* v. *United States*, 347 U.S. 62 (1954), the defendant was also a witness. There the trial court allowed Walder to be cross-examined concerning his prior inconsistent statements. The United States Supreme Court approved this cross-examination. However, the *Walder* Court stated: "He must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief."

In the case before us the trial court clearly violated the express words of the *Walder* case in allowing the prosecution to introduce by way of rebuttal evidence illegally secured by it. If the

appellant had taken the stand, and given testimony inconsistent with the prior statement, cross-examination concerning the statement may have been proper. However, the appellant had not taken the stand and obviously did not intend to do so. The state was allowed to do indirectly what it could not do directly, that is, to present evidence of the appellant's prior involuntary statement. She was forced either to testify or withdraw the witness. Thus, she was not free to deny all the elements of the case against her without giving leave to the Government to use its illegally procured statement.