Benny HUGHES *v.* STATE of Arkansas

CR 90-20                                    797 S.W.2d 419

Supreme Court of Arkansas
Opinion delivered October 15, 1990

*Dale Grady* and *William F. Magee*, for appellant.

*Steve Clark*, Att'y Gen., by: *R.B. Friedlander*, Solicitor General, for appellee.

DAVID NEWBERN, Justice. Benny Hughes was charged with capital murder for having caused the deaths of two persons with the deliberate and premeditated purpose of causing the

death of a person. Hughes testified that he shot Dave Potter and Hughes's wife, Leree, but he contended the shooting of Potter was in self defense and the shooting of Leree was accidental. A jury found Hughes guilty of first degree murder, and he was sentenced to life imprisonment. Hughes raised 15 points of appeal. We have combined some of them for discussion. The judgment is affirmed.

Police were called to the Hughes home at Lockesburg in Sevier County at 3:39 p.m. on December 28, 1988, by Judy DeWitt who had found Leree Hughes there, with most of her hair cropped off and shot but still breathing. She had also found the dead body of Dave Potter in the house. Mrs. Hughes died shortly thereafter in a hospital. Ms. DeWitt was a close friend, co-worker, and ex-sister-in-law of Mrs. Hughes. She had let herself into the Hughes home upon stopping by to pick up Mrs. Hughes on her way to work. She told the police that Benny Hughes was a person who could have done the shooting but that he was in California.

Benny Hughes was seen by a police officer driving his truck in Sevier County and was apprehended at 8:46 p.m. on the day the shootings were discovered. There is some question whether he was given a Miranda warning at that time, but one officer testified the warning was given. On his way to jail in a police car, Benny Hughes made incriminating statements. The officers did not attempt to ask him questions and told him he should not say anything until they could get to the station where they could "do it right." He persisted in speaking and related facts which are much the same as the ones he related at the trial.

Hughes said he had begun a trip to California on December 27, to begin working for his brother-in-law in a tree trimming business. He had made it to Arizona but changed his mind, deciding that the money was not worth being separated from his family. When he got back to his home between 2:00 and 3:00 p.m. on December 28, the front door was locked. He went in a rear entrance and encountered Leree in a hallway. She had just come out of a bedroom and was adjusting her shirt. He asked her what was going on, and she replied that she did not want to know.

The conversation progressed to the point where she admitted she had been seeing Dave Potter. Hughes slapped her, knocking her against the wall and injuring her lip. He then told Leree it was

over between them and went out to his truck to bring in his things and dump them on the floor in the living room. He said that when he returned to the house he noticed Leree's split lip and took her into the bathroom to treat it. He said they discussed the situation and decided to make up. However, he then asked her if she had slept with Potter and she replied that she had. He then pushed her, and she fell, injuring her head.

Hughes testified he apologized for having caused her to fall and noticed that her head was bleeding. He then took scissors and cut some of her hair so he could treat the cut. However, he ended up cropping her hair short over her whole head. He said his "subconscious" must have taken over because he had recently seen a movie where townspeople cut off the hair of a woman accused of adultery. He said Leree did not protest the cutting, and when he apologized for it she said it was alright because she had inflicted a far greater harm upon him, and they would "watch it grow back together."

While Leree was sweeping up her hair, Hughes went into their bedroom where he found Leree's gun lying on a table. He took it into the bathroom to ask Leree why it was out where the children had access to it, and the gun accidentally went off, startling them both. He then walked into the bedroom after Leree who intended to change her shirt which had blood on it. At that time he heard a noise behind him and he turned. He said he thought at first he caught sight of a dog in the other room. He then thought it was a large green frog. Instead, it was Potter who was, he said, coming at Hughes with a small knife. Hughes said he fired shots over Potter's head, and one of the shots grazed Potter's head. He told Potter to leave or he would be a dead S.O.B. Potter acted as if he were going to leave, but was hesitating because he was dazed by the bullet graze on his head. Hughes said Potter then attempted to attack Hughes again, and Hughes shot him twice.

Hughes saw Leree slump to the floor during his final altercation with Potter. He thought she had just fainted. He cradled her in his arms then realized her brain was coming out as she had been shot in the head and was bleeding. He then returned to Potter's body, which was lying face down on the floor, and shot him again. He left the house and drove his truck as if in a "dream"

to Antlers, Oklahoma, where he realized what had happened and then headed back to Sevier County. He disposed of the gun which has not been found.

Hughes testified that he went to the home of a relative where he learned that Leree was still alive, and he decided to turn himself in. He said he tried several times without success to telephone Randall Wright, a deputy prosecuting attorney, to find out what he should do. At that point he was arrested. He made a formal statement which was tape recorded and transcribed.

The only discrepancy between Hughes's formal statement and his testimony at trial was that he had brought his things in from the truck when he first arrived at home, rather than going out to get them after his initial encounter that afternoon with Leree as he said at the trial. The formal statement was excluded from evidence because the court concluded that Hughes should not have been questioned after he requested to be put in touch with Mr. Wright. The court did, however, permit the prosecution to refer to the statement for the purpose of impeachment of Hughes's testimony by pointing out the discrepancy.

The knife with which Hughes said Potter attacked was not found in the Hughes home by the officers who investigated the crime. After the trial, Hughes moved for a new trial on the basis of newly discovered evidence, contending that the knife had been found but had been stolen before a hearing could be held.

### 1. Sufficiency of the evidence and instructions

In some five points of appeal, Hughes questions the sufficiency of the evidence to support the conviction of first degree murder and instructions he contends were erroneous. We will not consider whether the evidence was sufficient because no motion for directed verdict was made. *Hayes* v. *State*, 298 Ark. 356, 767 S.W.2d 525 (1989); *Hughes* v. *State*, 295 Ark. 121, 746 S.W.2d 557 (1988).

Nor did Hughes object to the instructions given by the trial court or proffer ones he now suggests should have been given. He thus did not preserve for appeal any complaint about the court's instructions. *Wade* v. *State*, 290 Ark. 16, 716 S.W.2d 194 (1986); *Camp* v. *State*, 288 Ark. 269, 704 S.W.2d 617 (1986).

## 2. Refusal to suppress statements

Hughes contends the court should have suppressed the statements he made while seated in the police car. He contends he mentioned repeatedly that he had tried to get in touch with Randall Wright, and thus the statements he made in the presence of the officers should be suppressed. He does not contend he specifically asked to see Mr. Wright at that point.

When a suspect is questioned by police and requests the presence of counsel, the questioning must cease until counsel is provided. *Edwards* v. *Arizona*, 451 U.S. 477 (1981); *Hendrickson* v. *State*, 285 Ark. 462, 688 S.W.2d 295 (1985). Here, it is undisputed that the officers present attempted to get Hughes to stop telling them what had happened. There is no evidence that Hughes was questioned until he gave the statement that was ultimately suppressed and not allowed into evidence.

Even if there had been some error in allowing testimony as to what Hughes said in the police car, we would not reverse. Hughes cannot show prejudice, as the statements he allegedly made then were consistent with his self-defense testimony given .at the trial.

## 3. Defect in probable cause affidavit

It is contended that the information should have been quashed because the affidavit which was given in support of the arrest warrant for Hughes was dated the day after the arrest occurred. A motion was made to quash the information on that basis. The trial court did not rule on the motion but said it would be cleared up by the magistrate who had issued the warrant. The prosecutor contended the discrepency was the result of a typographical error.

We decline to consider the point further because the court made no ruling on the motion. *Walker* v. *State*, 301 Ark. 218, 783 S.W.2d 44 (1990); *Hamm* v. *State*, 301 Ark. 154, 782 S.W.2d 577 (1990); *Dildine* v. *Clark Equipment Co.*, 285 Ark. 325, 686 S.W.2d 791 (1985).

### 4. *Admissibility of "occult" material*

A briefcase containing "occult" material was found in the Hughes home. Hughes sought to introduce the items, which consisted of books and magazines, into evidence. His contention that they were relevant apparently was to the effect that Potter, Leree, and Judy DeWitt were involved in a sex, drug, occult scheme to kill him. The state contended that Hughes wanted them into evidence only to inflame the jury and that they would be irrelevant and unfairly prejudicial to the state's case. The court heard extensive argument on the relevancy of the items and held them inadmissible.

■ We cannot hold that the court erred. A trial court's determinations on questions of admissibility of evidence are discretionary. We do not reverse unless an abuse of discretion has been shown. *Walker* v. *State, supra; White* v. *Clark Equipment Co.,* 262 Ark. 158, 553 S.W.2d 280 (1977).

### 5. *Impeachment by suppressed statement*

As noted above, the prosecution was allowed to refer to the formal statement Hughes gave at the police station for the purpose of pointing out the discrepancy between that statement and Hughes's trial testimony.

■ No error occurred. In *Harris* v. *New York*, 401 U.S. 222 (1971), the Supreme Court held that a statement which had been suppressed for failure to give a *Miranda* warning could be used in cross-examination to impeach an accused who had given a contradictory statement at trial. We relied on the *Harris* case in *Hendrickson* v. *State*, 290 Ark. 319, 719 S.W.2d 420 (1986). There the trial court's ruling admitting a statement of an accused had resulted in reversal of a conviction. In the second trial the prosecution used the same statement for purposes of impeachment, and we declined to reverse, pointing out that the rationale of the *Harris* case applied. It applies directly in this case.

### 6. *The new trial issues*

The decision whether to grant a new trial is within the discretion of the trial court. *Vasquez* v. *State*, 287 Ark. 468, 701

S.W.2d 357 (1985); *Harvey* v. *State*, 261 Ark. 47, 545 S.W.2d 913 (1977). As we pointed out in the *Vasquez* case, citing *Kirkendall* v. *State*, 265 Ark. 853, 581 S.W.2d 341 (1979), newly discovered evidence is a least favored ground for granting the motion. We find no abuse of discretion in the court's failure to grant a new trial on the basis that the knife allegedly used by Potter had been found.

We can hardly hold that the trial court abused its discretion in refusing to grant a new trial on the basis of newly discovered evidence which Hughes could not produce for the court's consideration. Even if the court had been required to believe that a knife like the one Hughes thought he saw in Potter's hand had been found, we could not reverse because the matter would still have been one for the trial court's discretion, and no abuse would have been shown.

Nor do we find any abuse in the trial court's failure to grant a new trial on the basis that an auxiliary policewoman was allowed to sit as a juror. No objection was made to the juror on voir dire, and there is no complaint that the opportunity to question her was limited in any way.

The remaining point argued with respect to the refusal to grant a new trial is also one that was waived. The contention is that a juror had a conversation with Deputy Prosecutor Wright during the trial.

During a recess a juror inquired of Wright about his mother's health. He responded she was fine and, then he walked out of the jurors' presence. Even if there were any possibility of prejudice resulting from this conduct, we would not consider it for, as the judge pointed out in ruling on the new trial motion, no mention of the conversation was made during the trial, and thus the objection was waived.

### 7. *Plain error*

Hughes contends that a combination of pre-trial publicity about his original trial attorney, Phil Barton, having been arrested for possession of marijuana, combined with prosecutorial misconduct, amounted to "plain error."

The only mention of the attorney came when Hughes's trial

counsel was trying to show that Barton had discovered evidence at a crime scene which was overlooked by the police. There were other references to marijuana. Judy DeWitt testified she had seen Hughes use it. A box containing the drug was found in the home, and there was a contention that DeWitt had planted it there.

By invoking a "plain error" rule, Hughes seems to recognize that no objections were made at trial in support of the complaint he makes now, and there was no request for admonition of the jury. We require error to be pointed out at the trial, and we do not reverse for "plain error." *State* v. *Houpt*, 302 Ark. 188, 788 S.W.2d 239 (1990).

### 8. *Wright's participation in the trial*

Hughes contends the participation of Randall Wright in his trial was prejudicial because he was being prosecuted by the very lawyer with whom he contended he had wanted to discuss his case. We decline to rule on the point because, again, no motion was made at the trial to exclude Mr. Wright, and the issue was not raised in his motion for a new trial. The issue was not preserved for appeal. *Hamm* v. *State, supra.*

In accordance with Rules of the Arkansas Supreme Court and Court of Appeals 11(f), we have reviewed the abstracts for reversible error, and we find none.

Affirmed.